# Richmond

JAMES T. EUBANK v. JAMES WILLIAM HAYDEN.

April 24, 1961.

Record No. 5224.

Present, Eggleston, C. J., and Buchanan, Whittle, Snead, I'Anson and Carrico, JJ.

The opinion states the case.

*George C. Rawlings, Jr.* (*Franklin and Rawlings,* on brief), for the plaintiff in error.

*Frank B. Beazley,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

James T. Eubank (plaintiff) brought this action against James William Hayden (defendant) for alienation of the affections of and criminal conversation with the plaintiff's wife. He recovered a verdict against the defendant for $3,500 but the court set it aside and ordered a new trial. On the second trial the court refused to admit evidence of the withdrawal of $3,000 by the wife from a joint bank account, which was admitted in the first trial, and also struck out the plaintiff's evidence as to criminal conversation and submitted to the jury only the charge of alienation of affections. The jury returned a verdict for the defendant upon which judgment was entered and the plaintiff's action was dismissed. On this writ of error the plaintiff assigns numerous errors to the rulings of the court, including the setting aside of the first verdict and the refusal to set aside the second verdict.

Under the well established rule we must first look to the record of the first trial and if the court erred in setting aside the verdict rendered in that trial, the first verdict will be reinstated and all proceedings subsequent thereto will be annulled. *Barry* v. *Tyler,* 171 Va. 381, 199 S. E. 496; *Simmons* v. *Boyd,* 199 Va. 806, 809, 102 S. E. 2d 292, 294.

The first trial was had on December 22, 1958. The order setting aside the verdict in that trial and granting a new trial was entered December 8, 1959. From the order and the written opinion of the court it appears that the first verdict was set aside because the court concluded that the evidence to establish the adultery of the wife was so tainted that no credit should be given to it, and that

in the absence of credible evidence of adultery the testimony relating to the withdrawal from the joint bank account should not have been admitted.

The evidence on the first trial was not taken by a reporter and appears in the record in narrative form, and may be stated as follows:

The plaintiff and his wife were married on October 1, 1936, and lived together in Caroline county until March 23, 1958. They had three children, all boys, whose ages at the time of the trial were 21, 18 and 16. The two younger boys lived at home with their parents. On March 23, 1958, Mrs. Eubank left the home taking certain of her personal belongings and never returned and neither the plaintiff nor their sons knew where she was. The following August the plaintiff was granted an absolute divorce from her.

The plaintiff was employed by the American Viscose Corporation in Fredericksburg and became acquainted with defendant Hayden about six years before the trial while they were working together at the plant. During those years the plaintiff and his wife saw a great deal of Hayden. Hayden's first visit to the Eubank home was on plaintiff's invitation and thereafter plaintiff invited him to his house on numerous occasions and frequently asked him to take the plaintiff and his wife to the beach and other places and they did not go to the beach unless Hayden was along, even though plaintiff knew that Hayden and his wife were getting friendly with each other.

Hayden visited in the Eubank home both when Eubank was there and when he was not there. Neighbors testified to seeing him there at numerous times when Eubank was not at home and of seeing Mrs. Eubank riding around in Hayden's car. Plaintiff's brother-in-law told plaintiff that people were talking and he ought to run Hayden away. There was evidence that when plaintiff was at home Hayden would park his car in front of the house, but when the plaintiff was away Hayden would park in the back and come in through the back way. On one occasion Hayden was found eating breakfast in the Eubank home in the early morning when Eubank was not seen.

When Mrs. Eubank left around eight or nine o'clock on the morning of March 23 she was carrying a suitcase, and soon after she was out of sight Hayden drove by in his car going in the same direction.

The plaintiff testified that he loved his wife and gave her no

reason for leaving, and there was other evidence that they had lived together in harmony and comfortably. He said that he tried to locate her in Washington and other places but was unable to find her, but he had seen her and Hayden in a car twice since she left. He testified that when Mrs. Eubank left she had the appearance of being pregnant, for which he could not be responsible as he had a sterilization operation some years before. A physician testified to performing the operation. On cross-examination the plaintiff admitted that he had intercourse with his wife the night before she left, and regularly over the past year. Two days after Mrs. Eubank left, the two younger boys told him about hearing Hayden in their mother's room, as described below, but three days later he went to Hayden and asked him to take him (plaintiff) to Washington to try to find his wife, and he, his son and Hayden went to the home of Mrs. Eubank's mother in Washington for that purpose. He never accused Hayden of alienating his wife's affections until he brought this suit.

The defendant put into the record two letters, one dated April 2, 1958, written for the plaintiff by his attorney to Mrs. Eubank's mother expressing his willingness for the sake of his children to take his wife back and asking her help toward effecting a reconciliation. The other was dated April 15, 1958, from the plaintiff to his wife saying that he and the boys missed her and were having a hard time getting along without her and expressing the hope that she would come back.

Over the objection of the defendant the plaintiff testified that on March 21, 1958, two days before Mrs. Eubank left home, she drew a check on their joint bank account for $3,000, and the paid check was introduced in evidence.

William Eubank, one of the sons, 18 years old, testified that Hayden sometimes came to the house at night; that one night in February, after 11:30 p.m., before his mother left in March, he heard Hayden in his mother's room, next to his, and recognized his voice and heard him take off his shoes and get into bed; that he called to his mother but could not open the door as it was locked. He did not tell his father about this until the second day after his mother left because he was afraid as Hayden had a gun. He said nobody was in the room with him at the time of this occurrence and he knew of no other such occasion.

George Eubank, the other son who lived at home and was 16 years old, testified that Hayden would come to the home after his

father left for work; that on one such occasion when he and his brother were in bed he heard Hayden come in, pull off his shoes and get into bed with his mother and heard the bed screak; that he could tell his voice and was sure it was Hayden; that this was about two weeks before his mother left; that Hayden came to the house about two weeks before that at night when he heard the same thing; that he did not tell his father until after his mother left because he was afraid somebody might get hurt. He did not know how long Hayden stayed because he went to sleep. He said that on the night he heard his mother and Hayden his brother did not get up and did not go to the door.

Witnesses for the defendant testified to the friendly relations between Eubank and Hayden, and of Eubank's bringing Hayden cake to the plant and telling him that Mrs. Eubank sent it to him; and of Hayden, Eubank and Mrs. Eubank driving around together, usually with all three of them on the front seat with Mrs. Eubank in the middle. One of them testified that Eubank told him he knew "it had been going on a number of years and that it was as much his fault as it was Hayden's."

Defendant's only other witness was Mrs. Eubank's mother, who testified that back in 1951 she heard Eubank curse his wife; that she had seen Eubank hit his wife and had heard him say he would kill her, and since 1951 she did not think Eubank treated his wife right.

The defendant did not testify.

In its opinion the trial court said: "It is manifest from the testimony of these young men [the two Eubank boys] that both did not tell the truth. * * * Their evidence is wholly in conflict."

The jury decided otherwise and these were questions for them to decide. It will be observed that the younger boy seemed to speak of two occasions, on one of which his brother did not get up. Both testified explicitly that the event occurred, and the defendant did not deny it. Whether their testimony was in conflict, and if so whether the one or the other, or neither, should be believed, as well as the weight to be given to their delay in telling their father for the reasons they gave,—all were questions for the jury to decide, not for the court to determine. The jury are the sole judges of the credibility of witnesses and of the weight of the evidence. 7 Mich. Jur., Evidence, § 289, p. 683; *Alvey* v. *Butchkavitz*, 196 Va. 447, 453-4, 84 S. E. 2d 535, 539; 20 Mich. Jur., Witnesses, § 74, p. 535; *Edgerton* v.

*Norfolk Southern Bus Corp.*, 187 Va. 642, 651, 47 S. E. 2d 409, 414-5.

With respect to the wife's withdrawal of $3,000 from the joint bank account, the plaintiff testified that he had accumulated about $5,000 by his own earnings, as his wife had no income; that he had deposited this money in a joint bank account with his wife and that she drew on this account for the purpose of paying bills and regular expenses, and she had no authority to make a withdrawal from the account for her own use; but on March 21, 1958, two days before she left home, she drew a check to herself for $3,000 on this account, which was paid to her by the bank as shown by the canceled check. The defendant objected to this evidence on the grounds that it was not shown that the defendant had any connection with this withdrawal or that he received any of the money. These were not sufficient grounds for rejecting this testimony. The test of admissibility was not whether the defendant had profited by the transaction, but whether it represented a loss to the plaintiff directly and proximately caused by the defendant's wrong. 27 Am. Jur., Husband and Wife, § 543; 42 C.J.S., Husband and Wife, §§ 692, 693, 706.

The court instructed the jury, without objection, that if plaintiff was entitled to a verdict his recovery could include both compensatory and punitive damages, defining both, and that compensatory damages included the value of the lost affections, assistance, aid and companionship of the wife. 27 Am. Jur., Husband and Wife, §§ 523-525; 42 C.J.S., Husband and Wife, §§ 665, 698 b.; Anno., 31 A.L.R. 2d 713.

In *Harlow* v. *Harlow*, 152 Va. 910, 143 S. E. 720, a wife sued members of her husband's family for alienating his affections. Evidence was introduced to show that the defendants, or some of them, had persuaded the husband to change an insurance policy so as to make them beneficiaries instead of his wife, and that one of the defendants had drawn out most of a savings account in which earnings of the wife had been deposited. The court said that the defendants had not only disturbed the happy marital relations, but in addition "they absorbed by one means or another, in six weeks, over six thousand dollars which would have gone to the wife, the plaintiff, upon the death of her husband but for their interference" (152 Va. at 929, 143 S. E. at 725); that the jury had the right to take this into consideration in assessing punitive damages, and that the evidence with reference to the change of beneficiaries in the insurance

policy was admissible not only to show the attitude of the defendants toward the plaintiff, but "it was also proof of the success of the defendants' efforts to alienate the husband's affections, if he himself changed the beneficiaries, which they say he did." 152 Va. at 938, 143 S. E. at 728.

According to the only evidence in the record about it, the money in the joint account in the present case was earned solely by the plaintiff and he had deposited it to the joint credit of himself and his wife in order that she might draw on it for the purpose of paying bills and regular family expenses, and without any authority to her to take money from the account for her own use. The plaintiff certainly had an interest in the money in this account. The evidence shows only that it was a joint account. It does not show whether it was payable to either, or payable to the survivor. See Code §§ 6-55, 6-55.1; *King* v. *Merryman*, 196 Va. 844, 86 S. E. 2d 141.

It is undisputed that the money was deposited for a stated purpose and the part taken by Mrs. Eubank *pro tanto* defeated that purpose. Had it been allowed to remain in the bank and used for its intended purpose, it could and doubtless would have been of material aid, comfort and security to the plaintiff. By this act of the wife, proximately resulting, as the jury could have found, from the tort of the defendant, the plaintiff suffered damage which he was entitled to show along with the other circumstances connected with the alienation and desecration of his wife. It was relevant evidence, too, in proof of the previous relations between the plaintiff and his wife, his trust and confidence in her and his concern for her well-being in refutation of the attempt of the defendant to prove that she left home because of the plaintiff's mistreatment. It was not error to admit this testimony.

The evidence properly admitted in the first trial was sufficient to support the verdict rendered by the jury and the verdict should not have been set aside. It will be reinstated here, judgment thereon will be entered here for the plaintiff, and all proceedings subsequent to the first verdict are annulled.

*Reversed and final judgment.*